## Exhibit E

Defendant Target Corporation's Memorandum of Law in Support of Motion to Exclude Opinion Testimony from Plaintiff's Expert Anya Verkhovskaya, ECF Doc. 134, *Garcia v. Target Corp.*, No. 0:16-cv-02574-MJD-BRT (D. Minn., document filed Nov. 15, 2018)

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Israel Garcia, individually and on behalf
of a class of similarly situated
individuals,

No. 0:16-cv-02574-MJD-BRT

Plaintiff,

v.

Target Corporation,

Defendant.

**DEFENDANT TARGET CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO EXCLUDE OPINION TESTIMONY
FROM PLAINTIFF'S EXPERT ANYA VERKHOVSKAYA**

1

## Contents

Legal Standard ............................................................................................................. 3

Argument ..................................................................................................................... 3

I.      Ms. Verkhovskaya has provided no basis for her opinions, which should
        therefore be excluded. .................................................................................... 3

II.     The reverse-append method is inherently unreliable, and Ms. Verkhovskaya
        has formed opinions that are based on unreliable sources. ........................... 10

III.    Ms. Verkhovskaya made no effort to discover or exclude wrong-party calls
        that were miscoded because the called party supplied inaccurate
        information to Target's caller. ....................................................................... 18

IV.     Ms. Verkhovskaya is unaware of basic information about the relationship
        between cellular-telephone subscribers and users, yet has nevertheless
        formed opinions despite her lack of knowledge. ........................................... 20

Conclusion .................................................................................................................. 22

Defendant Target Corporation respectfully moves this Court for an order excluding opinion testimony from the Plaintiff's rebuttal expert, Anya Verkhovskaya.

## Legal Standard

Federal Rule of Evidence 702 provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[1]

A court, as the "gatekeeper" of scientific, technical, or otherwise specialized evidence under Rule 702, must assure that the trier of fact hears only reliable and relevant opinion testimony.[2]

## Argument

I.   **Ms. Verkhovskaya has provided no basis for her opinions, which should therefore be excluded.**

Rule 26(a)(2) provides that a disclosure of expert testimony "must be accompanied by a written report" that "must contain . . . a complete statement of

---

[1]Fed. R. Evid. 702 (testimony by experts).

[2]*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).

all opinions the witness will express *and the basis* or reasons for them."[3] Ms.

Verkhovskaya's report contains three conclusions that she does not support with

any evidence other than her own assertion:

> 37.     My analysis identified that 561 of the 1,000 Sample
> account numbers included Indicia (the "Sample Indicia Numbers").
> This represents 56% of the Sample.[4]
>
> 39.     In order to complete this analysis, I cross-referenced
> the Sample Data records (including the telephone number and date
> of call) against the IMS Files. I found that 301 telephone numbers
> (or about 54%) of the 561 Sample Indicia Numbers were wireless-
> identified.[5]
>
> 45.     For demonstrative purposes, I have coordinated the
> LexisNexis reverse-append identification. The initial step of the
> reverse-append methodology provided historical name and address
> information for 77% of the 753 telephone numbers submitted.[6]

Those conclusions, particularly the first two, are essential to Mr. Garcia's

calculation of his proposed class's size.[7] The third conclusion supposedly

illustrates the efficacy of Ms. Verkhovskaya's reverse-append process — a

process whose efficacy Target disputes.

---

[3]Fed. R. Civ. P. 26(a)(2)(B)(i).

[4]Verkhovskaya Rpt. [Doc. 101-12], ¶ 37 at 11.

[5]*Id.*, ¶ 39.

[6]*Id.*, ¶ 45 at 12.

[7]*See* Doc. 100 at 7.

Target therefore served a subpoena seeking testimony from Ms. Verkhovskaya, as well as production of "[t]he documents and other information that you relied on or considered in forming the opinions you have expressed or will express in this action."[8] Ms. Verkhovskaya was unavailable before the expert-discovery deadline, so the Parties submitted a stipulation asking that the Court "extend the expert-discovery deadline through November 8, so that Target can take Ms. Verkhovskaya's deposition."[9] The Court entered an order that "[t]he expert discovery deadline is extended through November 8, 2018, for the limited purpose of defendant deposing Ms. Verkhovskaya," but providing that "[a]ll other applicable requirements and deadlines" in the scheduling orders "remain in full force and effect."[10] Ms. Verkhovskaya's deposition occurred, at her request, on November 8, 2018, the latest possible day under the order.

Target's attorney came to Ms. Verkhovskaya's deposition prepared to examine her about her calculations, and particularly to test a hypothesis that Ms. Verkhovskaya had made material errors in her analysis. But surpisingly, Ms. Verkhovskaya had brought nothing — no documents, no data — with her to the deposition, and was not prepared to defend her conclusions:

---

[8] Subpoena [Ex. B].

[9] Doc. 113, ¶ 4 at 3.

[10] Doc. 115.

5

Q     And you are here today in response to a subpoena from my
      client, correct?
A     That's correct.
Q     All right.· Did you bring any documents with you in response
      to the subpoena?
A     No, I did not.[11]

Q     Okay.· And so when you say you found that 301 telephone
      numbers, or about 54 percent, were wireless identified, were
      they wireless identified at the time that you ran — were they
      wireless at the time that you ran the search, or were they
      wireless at the time of the call that you were looking at?
A     They were wireless at the time of the call.
Q     Do you have the set of 561 numbers if we wanted to cross-
      check those?
A     Yes, I do.
Q     Did you bring them with you today?
A     No, I did not.
Q     Okay.· So I'm not able to ask you about them today; is that
      correct?
A     You can ask me about them today.
Q     Well, I mean, my question is, which of the— which 561
      numbers are we talking about?· But I imagine you are not
      able to answer this as you sit here?
A     I did not memorize the numbers.[12]

Q     Okay.· When you refer to the 753 telephone numbers
      submitted, how would I find out which 753 numbers we are
      talking about?
A     You would ask for those numbers.
Q     Okay.· And I take it you didn't bring them with you today?
A     I did not.
Q     Okay.· And I take it you don't have them memorized?
A     I do not.[13]

-------------------

[11]Verkhovskaya Dep. [Ex. C] at 5:22 – 6:2.

[12]*Id.* at 18:16 – 19:10.

[13]*Id.* at 26:14–22.

Target believes that it can show serious errors both in Ms. Verkhovskaya's methods and in her results. For example, in the sibling case, *Diaz-Lebel v. TD Bank USA, N.A.*,[14] the Defendants' expert Jan Kostyun has shown that Ms. Diaz-Lebel's expert Jeffrey Hansen used flawed methodology that frequently misidentifies whether a telephone number was a landline or was assigned to a wireless block at the time of a wrong-party-coded call from Target.[15] Mr. Kostyun has also identified other errors in Mr. Hansen's data analysis.[16] Target believes that Ms. Verkhovskaya's methodology and results are similarly flawed, and that Target could fairly easily expose those flaws. But because Ms. Verkhovskaya has not shown her work, Target has no way of checking or challenging that work.

Ordinarily, such concealment of relevant, material evidence would be grounds for an order compelling discovery. But because Target and the Court had accommodated Ms. Verkhovskaya's unavailability for a deposition before the

---

[14]*Diaz-Lebel v. TD Bank USA, N.A.*, No. 0:17-cv-05110-MJD-BRT (D. Minn.).

[15]Kostyun Rpt., *Diaz-Lebel* [Ex. E], ¶¶ 44–64 at 24–41 ("Opinion C. Hansen's analysis of the call data records, and his attempt to identify those numbers that were wireless at the time of alleged calls, is erroneous. It appears that Hansen does not understand how to properly navigate the complex numbering resources to identify historic wireless numbers.").

[16]*Id.*, ¶¶ 65–66 at 41–42.

expert-discovery deadline, the deadline for a motion for an order compelling discovery had already passed by the time of Ms. Verkhovshaya's deposition.[17]

Since an order compelling production is unavailable, Target seeks to exclude Ms. Verkhovskaya's opinion testimony: "An opinion has a significance proportioned to the sources that sustain it . . . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."[18]

This Court should exclude Ms. Verkhovskaya's testimony under its inherent authority as the "gatekeeper" of scientific, technical, or otherwise specialized evidence under Rule 702, whose duty it is to assure that the trier of fact hears only reliable and relevant opinion testimony.[19] But the Court should also exclude Ms. Verkhovskaya's testimony under Rule 37(c)(1):

> If a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.[20]

---

[17] *See* Doc. 68 at 4 ("All non-dispositive motions relating to expert discovery must be filed and served by November 2, 2018.").

[18] *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).

[19] *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).

[20] Fed. R. Civ. P. 37(c)(1) (failure to disclose).

8

Mr. Garcia and Ms. Verkhovskaya have failed to disclose, as Rule 26(a)(2)(B)(i) requires, "the basis and reasons" for her opinions. They should not be allowed to use those unsubstantiated opinions in this action.

Other courts have used Rule 37(c) to exclude opinion testimony.[21] For example, the Court of Appeals for the Tenth Circuit found no abuse of discretion in excluding opinon testimony where the opposing party "would have had no pre-trial opportunity to learn the substance of the expert's direct examination testimony."[22] Likewise, a federal court in Montana excluded opinion testimony as to "any opinion or evidence based on undisclosed data or testing" where "[n]one of the data collected during [the expert's] testing and inspections were included with his expert disclosure," and the data underlying the expert's opinion were not provided until two days before the expert's deposition.[23] Here, despite being requested to provide the information upon which she based her opinions, Ms. Verkhovskaya failed to do so. Her opinions should be excluded.

---

[21]*See, e.g., Pace v. Capobianco*, No. CV100-032, 2000 U.S. Dist. LEXIS 22924, at *6–7 (S.D. Ga. 2000) ("The problem is that [the expert's] report does not sufficiently explain the rationale behind his opinion . . . .").

[22]*Kern R. Gas Transmission Co. v. 6.17 Acres of Land*, 156 F. App'x 96, 102–03 (10th Cir. 2005).

[23]*Olson v. Mont. Rail Link, Inc.*, 227 F.R.D. 550, 551 (D. Mont. 2005).

II.     **The reverse-append method is inherently unreliable, and Ms.
        Verkhovskaya has formed opinions that are based on unreliable
        sources.**

Ms. Verkhovskaya argues that her reverse-lookup methodology is objective

and reliable. But in fact, it is just glorified skip tracing, and is every bit as

unreliable and error-prone as skip tracing is. Ms. Verkhovskaya often refers to her

methodology as "reliable" or "verfied," and claims that her methodology has

undergone "independent" review,[24] but in each case it is she herself (or a team that

she led) who checked her own methodology and data, and found herself reliable.[25]

Here she did not even do that:

> Q      Paragraph 45, the second sentence says, "The initial step of
>        the reverse-append methodology provided historical name
>        and address information for 77 percent of the 753 telephone
>        numbers submitted." My question is, did you validate the
>        accuracy of the historical name and address information?
> A      Can you clarify if your question references the process or
>        these particular numbers?
> Q      These particular numbers.
> A      I did not.
> Q      Okay. Is there — is there a process for doing that?
> A      Yes.
> Q      And how would you go about it?
> A      You can send out claims.

----

[24]*See, e.g.,* Verkhovskaya Rpt. [Doc. 101-12], ¶ 52 at 13; *id.,* ¶ 78 at 18.

[25]*See, e.g., id.,* ¶ 52 at 13 ("Through my independent review of test and live
case files over the years, I have verified the accuracy of the reverse-append
information I receive and have found it to be reliable."); *id.,* ¶ 78 at 18–19
("Through my review of test and live case files, I have verified the accuracy of the
LexisNexis information and have found it to be reliable.").

Q     Okay. So the process is asking the people who are the —
who are shown in the records what the information is; is that
correct?

A     If you would like to validate that information, yes.

Q     Okay. And have you ever validated that kind of information
in another case?

A     Yes.

Q     Through the claims process?

A     Yes.

Q     Okay. In any other way?

A     We did a lot of independent testing of the database but not
within the context of a case.

Q     When you said "we did a lot of independent testing," who is
the "we"?

A     While I was working for A.B. Data, myself and my team
tested LexisNexis's reverse-append results over a period of
approximately five years, and the accuracy varied anywhere
from 86 to 97 percent.[26]

Q     I understand. In paragraph 50, you make the assertion that
the data processors "provide accurate and reliable
information"; do you see that?

A     Yes, I do.

Q     How do you come to the conclusion that they provide
accurate or reliable information? Is it what you just
described, or anything in addition to that?

A     It's what I just described and, in addition, live test — live
case testing through claims processing.

Q     Okay. And when you say "live case testing," you are talking
about the claims processing you've just described where you
identify the universe from the database, and then you query
those people about whether you've got the right information;
is that correct?

A     That's correct.

Q     Is that the same verification and reliability that you are
referring to in paragraph 52?

A     Yes.

---

[26]Verkhovskaya Dep. [Ex. C] at 24:9 – 25:20.

Q      Are you aware — other than verification by you or by a team
       that you are working with, are you aware of any other
       independent testing of LexisNexis accuracy or reliability?

A      No.

Q      Or any other data processor?

A      No.

Q      And then in paragraph 56, you again assert that the processes
       are reliable and are reasonably relied on.· Is that the same
       basis we have been talking about?

A      Yes.[27]

Q      Okay.· In paragraph 64, you refer to having conducted
       numerous tests of your methodology.· Does that refer to what
       you've already testified about, or is that something different?

A      I testified about that testing.[28]

Q      Okay.· In paragraph 78, still on the same page, you refer to
       your independent verification of that data.· Is that the same
       verification process that we have already talked about?

A      Yes.[29]

So her "independent" validation process consists primarily of notifying people that

they have a claim that will bring them money, and asking those people whether

they are the ones who should get the money. It should come as no surprise that

those people affirm Ms. Verkhovskaya's methods as much as she herself does.

In fact, though, Ms. Verkhovskaya's methodology is highly *un*reliable. It

may well produce a result — but not a reliable result. As one federal court

recognized last year in denying certification of a wrong-number class, "there is no

---

[27] *Id.* at 27:20 – 29:2.

[28] *Id.* at 31.8 – 12.

[29] *Id.* at 33:23 – 34:2.

public database of cell phone subscribers, and private services are often inaccurate and incomplete."[30] The issue is not only with identifying the particular cell-phone subscriber at some point in the past, but with establishing with certainty whether a telephone number is "assigned to a . . . cellular telephone service"[31] at all: as another federal court has explained, "there can never be common answers to the questions of whether . . . the telephone number dialed was assigned to a cellular telephone at the time of the call."[32]

Federal Communications Commission chairman (then commissioner) Ajit Pai, in his dissent to the 2015 TCPA Order, observed that "no authoritative database — certainly not one maintained or overseen by the FCC, which has plenary authority over phone numbers — exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers.'"[33] The Commission, in light of the *ACA Int'l* ruling, issued a notice of

---

[30] *Jacobs v. Quicken Loans, Inc.*, No. 15-81386-CIV-MARRA, 2017 WL 4838567, at *3 (S.D. Fla. Oct. 19, 2017).

[31] 47 U.S.C. § 227(b)(1)(A)(iii).

[32] *Shamblin v. Obama for Am.*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *7 (M.D. Fla. Apr. 27, 2015).

[33] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Pai Dissent at 3, 30 FCC Red. 7961, 8077 (F.C.C. July 10, 2015) (quoting Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015)).

proposed rulemaking that "seeks comment on ways to address this reassigned

numbers problem" and

> Seeks feedback on three alternative ideas for service providers to
> report that information: (1) requiring service providers to report
> reassigned number information to a single, FCC-designated
> database; (2) requiring service providers to report that information to
> one or more commercial data aggregators; or (3) allowing service
> providers to report that information to commercial data aggregators
> on a voluntary basis.[34]

But the Commission has not yet acted, and none of its proposed solutions has yet

materialized.

Target's expert Jan Kostyun has analyzed this issue in exacting detail, and

has concluded that

> In my opinion, there is no single, uniform source or means to
> identify, accurately and reliably, the historic wireless status of the
> telephone numbers called by Defendant in this case. Additionally, it
> is my opinion that there is no single, uniform source or means to
> identify, accurately and reliably, subscribers and users of cell phone
> numbers as of the dates of particular calls. As a result, it is also my
> opinion that any attempt to reliably and accurately identify historic
> subscribers and users of particular numbers will require an account-
> by-account, number-by-number, and person-by-person analysis
> across a variety of sources, including cell phone providers, the
> subscribers and users themselves, and potentially other sources. This
> is because there is no public or commercial database through which
> complete wireless status and historic subscriber and user information
> can be obtained by reference to a set of telephone numbers. All
> available methods of identifying wireless status and subscribers and

---

[34]News Release, "FCC Seeks to Address Robocalls to Reassigned Phone
Numbers" (Mar. 22, 2018), *online at* https://www.fcc.gov/document/fcc-seeks-
address-robocalls-reassigned-phone-numbers-0 (accessed Nov. 13, 2018).

users do not provide a viable alternative because they are inaccurate and unreliable.[35]

Target's own experience illustrates the difficulty and unreliability of the reverse-lookup process. Mr. Garcia's proposed class would include calls that reached spouses, other relatives, roommates, and others who have a relationship with a Target cardholder and who may have answered a call to a Target cardholder's telephone where the cardholder has given prior express consent for the call. One cannot assume even that spouses, or children and their parents, share the same surname — let alone that other relatives or roommates do — or that their names appear in the reverse-lookup records. Target has run into this issue in other cases: for example, in one case, the plaintiff claimed that Target was liable for no other reason than that one family member (the plaintiff's father), who was not the listed subscriber (the plaintiff's deceased grandmother) but controlled the phone after the subscriber's death, passed a *family* telephone from one user (the plaintiff's step-sister) to another user (the plaintiff's brother) — and, *one day later*, the first primary user (the step-sister) provided the phone number to Target as the number where Target could reach her about her debit-card account. Target's cardholder had a different surname than the plaintiff.[36]

---

[35] Kostyun Rpt. [Doc. 123-2], ¶ 45 at 29–30.

[36] *See* Target's Motion Summ. J., Doc. 31 [Doc. 123-1] at 2–5, *Sokolsky v. Target Corp.*, No. 3:14-cv-914-TJC-MCR (M.D. Fla. filed Apr. 23, 2015).

Mr. Kostyun's report offers numerous other illustrations of the reverse-lookup process's unreliability, starting with an analysis of "public identification services and skip tracing,"[37] then giving specific examples:

C.     In past cases, I have analyzed subscriber information by cross-checking it using LexisNexis, six web-based reverse number services, and a seventh, API-based service. In many cases, the subscriber names returned by these identification services varied significantly. These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues.

D.     By way of further example, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number. I am familiar with her number, and I know she has been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years. Several search sites provided no results at all. Using the search site whoeasy.com, the phone number was found, and I paid a small fee to receive the report that should have returned her name and address. The results of the search included the name Gerald Darling and an address in Virginia. Gerald Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past seven years. I also performed the same search using an API-based service from searchbug.com, and received the same name and address for Gerald Darling.[38]

Ms. Verkhovskaya would use LexisNexis's skip-tracing service for her reverse-lookup method of identifying class members, and Mr. Kostyun's final example involves Ms. Verkhovskaya's method:

---

[37]Kostyun Rpt. [Doc. 123-2], ¶ 22 at 11–16.

[38]*Id.*, ¶ 22(D)–(E) at 14–15.

E.    In *Goins v. Walmart and Palmer Recovery Attorneys* — for
which I provided an expert rebuttal report in support of
Defendants — Plaintiff's expert claimed that she processed
the telephone number belonging to Plaintiff and class
representative Amber Goins, using LexisNexis as her vendor,
and that this process identified the number as belonging to
Ms. Amber Goins. In reality, when Plaintiff's expert and her
team provided Plaintiff Goins' telephone number to
LexisNexis, the results that were returned included only the
names "LaShante McCall", "Kenia Ayala" and "Lesley
Goins". The purported identification by LexisNexis was
faulty in 15 numerous ways: Plaintiff Amber Goins was never
identified by LexisNexis as being associated in any way to
the subject telephone number; in identifying Lesley Goins'
association with the subject telephone number, LexisNexis
provided no data or indication that connected Lesley Goins to
Plaintiff Amber Goins; in identifying Lesley Goins'
association with the subject telephone number, LexisNexis
did not provide a date range that covered the relevant time
period of the call(s) at issue; once Plaintiff's expert received
the information from LexisNexis regarding Leslie Goins, she
deviated from her documented methodology, and performed a
manual, individualized investigation in an attempt to connect
Amber Goins with Lesley Goins, and therefore connect
Amber Goins with the subject telephone number. And when
questioned at deposition, Plaintiff's expert even suggested
that she might ask Plaintiff's counsel to help determine the
relationship between Lesley Goins and Amber Goins. This
example clearly shows how the usage of skip-tracing vendors
such as LexisNexis to correlate telephone numbers to users or
subscribers has been unsuccessful, and further exhibits the
need for individualized inquiries to provide accurate user
identification.[39]

---

[39]*Id.*,¶ 22(E) at 14–15.

The reverse-lookup process is unreliable because there is no public
database of cell phone subscribers, and private services are often inaccurate and
incomplete.

III.   **Ms. Verkhovskaya made no effort to discover or exclude wrong-party
calls that were miscoded because the called party supplied inaccurate
information to Target's caller.**

Wrong-party codes are often entered in error — either because the called
party (from whom Target *has* obtained prior express consent) supplies inaccurate
information to Target's caller, or because Target's caller miscodes the call (in
which case the call was actually made to Target's cardholder, and no wrong party
was involved).

Ms. Verkhovskaya concluded that 429 out of the 1,000 accounts — about
43 percent — were miscoded.[40] She excluded those calls from her analysis, which
was mostly an electronic search, but also required a manual review.[41] But her
analysis made no effort to discover, let alone exclude, wrong-party calls that were
miscoded because the called party supplied inaccurate information to Target's
caller.

For Mr. Garcia's class-certification motion, Target undertook a manual
analysis of the account notes in the 1,000-account sample for the 464 wrong-party-

---

[40]Verkhovskaya Rpt. [Doc. 101-12], ¶ 37 at 11.

[41]Verkhovskaya Dep. [Ex. C] at 14:17–23.

18

coded calls that Target could identify as calls to a cellular-telephone number, in order to determine how many were miscoded. Within the 464 known cellular-telephone numbers, Target discovered 45 certain miscodes (9.7 percent), plus another 118 probable miscodes (25.4 percent), for a total of 163 (35.1 percent).[42] This 35-percent error rate is consistent with the 31-percent error rate in Target's internal testing (which was not conducted for this lawsuit's purposes).[43] These errors do not, of course, include errors that cannot be discovered — such as where a cardholder whose account is past due tells the Target caller that the call has reached a wrong number, even though it hasn't — so the true error rate is necessarily higher.[44]

Target also undertook an analysis of "mismatched" wrong-party codes — that is, calls that were coded as wrong-party calls in the dialer, but not in the TSYS notes. That analysis found an error rate of 18.07 percent just for that one kind of error. Of course, a mismatch could mean that the wrong-party code was correct as easily as that it was incorrect— but assuming that the probability of an incorrect mismatched wrong-party code was about the same as the probability of a correct mismatched wrong-party code, an 18-percent error rate overall still means an error

---

[42]Wolf Decl., ¶ 21 at 6–7.

[43]*See id.*, ¶ 18 at 6.

[44]*Id.*, ¶ 20(c) at 7.

rate of about 9 percent just from miscoded entries alone. Ms. Verkhovskaya's

numbers are thus inherently unreliable and should be excluded.

IV.   **Ms. Verkhovskaya is unaware of basic information about the relationship between cellular-telephone subscribers and users, yet has nevertheless formed opinions despite her lack of knowledge.**

Ms. Verkhovskaya opines that Target expert "Kostyun raises the possibility

of issues identifying the subscriber and/or authorized user of a cellular telephone

number. In the majority of cases, these are one in [sic] the same."[45] She suggests

that a cellular-telephone number's subscriber is usually the person who uses the

phone and thereby implies that, if the subscriber of record isn't the cardholder that

Target was calling, then the subscriber must be a class member. But at her

deposition, she offered no scientific or other reliable basis for that conclusion:

> Q   Look at paragraph 79, please. In the second sentence, you say that, "In the majority of cases, these are one and the same," equating the subscriber and the authorized user. What is the basis for your assertion that that's true in the majority of the cases?
>
> A   Based on our experience and a common-sense understanding of the consumer behavior, most of the applications for the households are made by the heads of the households, whether there is a refinancing or credit bureau — head of the household — application for car loan or student loan, utility bills. We feel, based on our experience and common sense, that the consumer behavior is such that most likely are not these types of documents are completed by the head of the household who is also often a subscriber.
>
> Q   Have you ever performed a scientific analysis to come up with a number of how often it's the case? When you say a

---

[45]Verkhovskaya Rpt. [Doc. 101-12], ¶ 79 at 19.

> majority of the cases, I wonder if you know a specific
> number?
>
> A    I do not.
>
> Q    Have you ever seen a testing done by anybody else that has a
> specific number?
>
> A    No.[46]

But there are such studies, and they belie what Ms. Verkhovskaya's "experience

and . . . common-sense understanding of the consumer behavior" tell her:

- Forrester Research estimated in 2012 "that 75 percent of U.S.

  wireless subscribers are on discounted, multiple-line family plans."[47]

- PwC found in its 2013 North American Wireless Industry Survey

  that "57 percent of [postpaid] subscribers are on family plans as of

  December 31, 2013, which is a slight increase from 54 percent as of

  December 31, 2012."[48]

Those statistics undercut Ms. Verkhovskaya's untested assumption that her

reverse-lookup methodology can easily identify a phone number's historical

subscriber because the subscriber of record is usually "one [and] the same" as the

user.

---

[46]Verkhovskaya Dep. [Ex. C] at 34:3 – 35:2.

[47]Andy Vuong, "Wireless subscribers are finding breaking up is . . . ,"
*Denver Post*, Sept. 14, 2012, *online at*
https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/ (accessed Nov. 14, 2018).

[48]PwC, *Streaming Live: Operating in the Age of Innovation* [Ex. A] 55
(Feb. 2015).

## Conclusion

Ms. Verkhovskaya has not adequately disclosed the basis for her opinions.

The reverse-append method is inherently unreliable, and Ms. Verkhovskaya has formed opinions that are based on unreliable sources.

Ms. Verkhovskaya made no effort to discover or exclude wrong-party calls that were miscoded because the called party supplied inaccurate information to Target's caller.

Ms. Verkhovskaya is unaware of basic information about the relationship between cellular-telephone subscribers and users, yet has nevertheless formed opinions despite her lack of knowledge.

Therefore, Target respectfully asks that this Court exclude Ms. Verkhovskaya's opinion testimony.

November 15, 2018.

BARNES & THORNBURG LLP

/s/ Brian Melendez

Brian Melendez
Bar Number 0223633
Attorney for Defendant
   Target Corporation
BARNES & THORNBURG LLP
Suite 2800
225 South Sixth Street
Minneapolis, MN 55402-4662
Ph. 612.367.8734
Fax 612.333.6798
brian.melendez@btlaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Israel Garcia, individually and on behalf
of a class of similarly situated
individuals,

No. 0:16-cv-02574-MJD-BRT

Plaintiff,

v.

Target Corporation,

Defendant.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Pursuant to Local Rule 7.1(f)(2), I certify that the Memorandum of Law in

Support of Motion to Exclude Opinion Testimony from Plaintiff's Expert Anya

Verkhovskaya complies with the limits in Local Rule 7.1(f) and with the type-size

limit of Local Rule 7.1(h). The memorandum contains 4,692 words. I relied on the

word-count function of the word-processing program, Microsoft® Office Word

2010, whose word-count function has been applied specifically to include all text,

including headings, footnotes, and quotations.

November 15, 2018.

BARNES & THORNBURG LLP

/s/ Brian Melendez

Brian Melendez
Bar Number 0223633
Attorney for Defendants
BARNES & THORNBURG LLP
Suite 2800
225 South Sixth Street
Minneapolis, MN 55402-4662
Ph. 612.367.8734
Fax 612.333.6798
brian.melendez@btlaw.com

2